Dockets.Justia.com

1  David R. Flood
2  915 L. St. 292
   Sacramento, CA. 95814
3  Telephone (916) 607-6197

**FILED**

JAN 1 4 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
             DEPUTY CLERK

4

5        UNITED STATES DISTRICT COURT
6    FOR THE EASTERN DISTRICT OF CALIFORNIA

7                              2:08 - CV - 0 0 9 1 GEB JFM PS

8  DAVID RODERICK FLOOD, on behalf of      Case No._____
   West Coast Sports & Entertainment, the state   CLASS ACTION CIVIL SUIT FOR
9  of California, and all others similarly situated
   therein
                                           (1) VIOLATION OF CHAPTER 1
10                                              SHERMAN ACT
         Plaintiff
11                                         (2) VIOLATION OF CA. CONSUMER
     vs.                                       LEGAL REMEDIES ACT (CIVIL
12                                             CODE 1770, 1752, 1780, & 1781
   NATIONAL FOOTBALL LEAGUE

# INTRODUCTION

This civil suit is hereby filed in the United States District Court (Eastern District of California) between the plaintiff West Coast Sports & Entertainment, and the defendants, the National Football League, NFL franchise owners, Oakland Raiders, NFL Properties, NFL Films, and Reebok Inc., which involves violated laws and statutes pertaining to U.S. commerce and trade and moral turpitude, or conduct that is considered contrary to community standards of justice and honesty that the plaintiff alleges have been transgressed upon the American public unawares --over a period of decades—under a cloak of unfair and deceptive business practices. In a scheme to defraud the people of the state of California and other football fans across the United States, the National Football League represented by Commissioner Pete Rozelle, made identified false and misleading statements which became a matter of public interest to the plaintiff/plaintiff class (people of the state of California) that formed a part of the public's dialogue/concern within the core area of commercial expression. The National Football League's commissioner became a commercial speaker in 1966 whose false statements about football franchise locations and stadium seating irreparably harmed the plaintiff/plaintiffs. After the last California NFL franchises illegally relocated—the Los Angeles Rams and the Los Angeles Raiders in 1995 --during the next twelve years the League conducted several advertisements and broadcast them in print, television, and radio with a message to the plaintiffs that the League was going to place another franchise team back into the nation's 2nd largest market for sports. Without any results to this day, the fraudulent business operations of the National Football League have been inflicted intentionally and negligently per se amongst the general population of California and the United States uninterrupted in regards to their commercial marketing/promotion practices. Not only have their commercial messages defrauded 4 generations of Californians, but the

systematic way they went about deceiving the American public warrants justice. Their intentional interference with an economic advantage disenfranchised fan bases from across the United States away from their favorite teams, whose franchise owners did not care that the illegal acts of team relocations was a form of treason. The elements of this Sherman Act conspiracy violation still linger with Californians. These elements are:

(1) There was an economic obligation/relationship between a third party, the NFL and the plaintiff/plaintiffs. (2) Knowledge by the defendant owners of the existence of the economic relationship was known via the commissioner. (3) Intentional acts on the part of the defendant owners to disrupt the relationship occurred, and (5) Damage was actually done to the plaintiff/ plaintiffs—people of the state of California which were proximately caused by the acts of the NFL commissioner giving false statements to Congress/American public and the defendant owners in subverting the contingencies of obtaining the antitrust exemption from Congress (Buckaloo v. Johnson (1975 14 Cal. 3d 815, 827). As a matter of law, there is a threshold causation requirement in order to establish intentional interference with an economic advantage. What is required is proof that the lost economic advantage would have been realized but for the defendant's interference—illegal team relocations—which prevented franchise team cities from producing an economic impact on employment, tourism, marketing sales from fans abroad, etc., as a result of the interest and popularity of having a professional football franchise in their geographic area. The probability of a future economic benefit was disseminated fraudulently to the citizens of the 23 franchise cities that had pro football teams, and the millions of fans of those teams from other states. The proof of prevailing on this cause of action is evident by the conspiracy acts of the defendant NFL league commissioner/franchise owners; and plaintiff will prove that a Sherman Act conspiracy did take place involving a single entity (Supreme Court).

# THE PARTIES

**WEST COAST SPORTS & ENTERTAINMENT:**

Is a sports and entertainment corporation which promotes events for charities and the public.

Their headquarters are based in Sacramento, California.

**NATIONAL FOOTBALL LEAGUE:**

Is a major professional football league in the United States with 32 teams; its headquarters are

based in New York.

**NFL OWNERS:**

Own and manage the 32 franchise teams of the National Football League; their headquarters

are located in various cities in the United States.

**OAKLAND RAIDERS:**

Is a professional football organization that is a member of the National Football League; their

headquarters are located in Oakland, California.

**NFL PROPERTIES:**

Is a corporation jointly owned by the thirty-two member clubs of the National Football League.

They are the merchandising arm of the League with their headquarters located in New York.

**NFL FILMS:**

Is a corporation that makes commercials, television programs, feature films, and documentaries

for the National Football League; their headquarters are in New Jersey.

**REEBOK INC.**

Is the exclusive merchandise company for the National Football League; their headquarters

are located in Massachusetts and the United Kingdom.

The National Football League commissioner Pete Rozelle, pronounced an economic benefit to patriotic football fans from across the United States who followed these teams, which once said, was enough to persuade members of Congress to exempt the NFL from established antitrust laws and the passing of Public Law 89-800. Not only did Commissioner Rozelle petition Congress concerning the NFL/AFL antitrust exemption merger, but he also appeared before them in 1961 and was granted the passing of the Sports Broadcasting Act. He quoted then "that if the antitrust exemption was granted, it would bring stability to professional sports leagues and "PROTECT FOOTBALL FANS AND COMMUNITIES." 1971, five years after the NFL/AFL antitrust bill was signed into law in 1966, the oaths the commissioner had stated to Congress were breached by him and franchise team owners of the League, who without any consumer fan input, illegally began moving their teams to other parts of the United States, beginning with the New York Giants; other teams systematically followed suit: The Baltimore Colts, Los Angeles Rams, and the Oakland Raiders to name a few. Up until 1984, the NFL operated as a single entity (incapable of conspiring together with its members)-- Supreme Court. Later in this civil brief the plaintiff will refute this theory (see Oakland Raiders/NFL Properties vs. John Vella), Northern District Court of California Feb. 28, 2003. When the Oakland Raiders decided to relocate to Southern California in 1984 to the derision of their fan base, the plaintiff alleges that the NFL and Oakland Raiders engaged in "bogus litigation" where owner Al Davis alleged that the League was a "separate legal entity" in a restraint of trade lawsuit. A judgement in favor of Al Davis technically gave the NFL "separate legal entity" status, which would exempt the National Football League from any antitrust liability if a case arose prior to this one. Truth is, the League/franchise owners (as a single entity) gained antitrust status by fraud and moved teams illegally throughout the United States.

-5-

All of the following elements are still in force (as per Clayton Act Tolling by Fraudulent Concealment) where the National Football League and NFL owners interfered and breached an obligation with the plaintiff/plaintiff class: people of the state of California which are:

1.) There was a promise/obligation between Congress, the plaintiff/plaintiff class: people of State of California, and third party, NFL Commissioner Pete Rozelle representing the league and franchise owners. 2.) That the defendant (NFL owners) knew of the promise/promises to Congress prior to the granting of the antitrust exemption to merge the NFL with the AFL. 3.) That the defendant (owners) knew of the contract through the third party Commissioner Pete Rozelle. 4.) The defendant (owners') conduct of breaching those promises caused the NFL, (third party) not to honor the obligation. 5.) That Congress, plaintiff/plaintiffs were harmed as a result of the breach and 6.) That the owners' conduct was a substantial factor to causing harm to the plaintiffs. Here the plaintiff representing this civil suit alleges that there was a pre-meditated conspiracy to defraud the plaintiffs of California, the United States Government (Congress), and the other citizens of the United States outside of California, by stating to members of Congress that pro football would severely be destabilized if an antitrust exemption from chapter 1 of the Sherman Act was not granted. The plaintiffs, however, became traumatized and disassociated from teams once the illegal franchise moves began to take place, without any recourse from the NFL's governing authorities. Affidavits obtained by the plaintiff affirm the NFL's "destabilization theory" (Only) because of the defiance and negligent acts of the team owners', who moved their franchises—against the precepts of the antitrust merger— illegally to other parts of the country. House of Representatives report 104-656, parts 1 & 2 of the FAN FREEDOM AND COMMUNITY PROTECTION ACT OF 1996, Representatives John Conyers Jr., Zoe Lofgren, Stephen E. Buyer, and Ed Bryant dissented on the bill becoming

law which, if passed, would have allowed NFL franchise relocations across the United States, superceding Commissioner Pete Rozelle's promise to Congress that no teams in their traditional cities would relocate elsewhere; this promise/statement was a prerequisite to Congress acting on behalf of the National Football League and granting them the antitrust exemption (public law 89-800). The fact that the authors of H.R. 2740 wanted to hide or shade the breaches and violations of the antitrust bill by trying to pass this bill, gives evidentiary support that they did not want the public to become aware of their fraudulent behavior (the franchise owners/NFL's blatant interference with an economic advantage) when the NFL allowed the Los Angeles Rams to leave the state of California, as well as other team movements across the country, leaving fans/city fan bases in a state of "franchise trauma" or "rape". In addition to this misconduct, the league allowed the franchise owners to blackmail their own fan bases (city municipalities etc.), while they negotiated with other cities who would—if the local fan bases did not satisfy their wants—relocate to that city; this was definitely manifested by the illegal franchise moves from 1971-1984. The Representatives carefully weighed the negative repurcussions that would have come about with the new statute of NFL team relocations and came to the conclusion that MANDATORY EXPANSION OR TEAM RELOCATIONS WOULD BE INNAPPROPRIATE, AND THAT UNNECESSARY INTERVENTION INTO SPORTS CONTRACTING ARRANGEMENTS (I.E., FUTURE ANTITRUST EXEMPTIONS) were not in the Government's best interest, and dissented on H.R. 2740. Now that the National football League has realized the harm they have brought upon professional football fans, they are now trying to get a bill passed which would stop franchise moves (SB 249—California Senator Dianne Feinstein).

-7-

# BACKGROUND AND NEED FOR THE LEGISLATION

*Background*

In 1960, the National Football League (`NFL') came to the United States Congress seeking relief from antitrust laws. The NFL argued on behalf of all three of the major sports leagues not already enjoying exemptions from the federal antitrust laws (football, hockey, and basketball), that in the absence of a limited antitrust exemption, teams in smaller markets would not be able to survive financially because the television revenue available to teams in large markets would enable them to hire the best players--a situation that could seriously detract from balance on the playing field and threaten the leagues' very existence.

To bring stability to the major professional sports leagues and protect fans and communities, Congress passed, and President Kennedy signed into law, the Sports Broadcasting Act of 1961, 15 U.S.C. Sec. 1291 *et seq.* The new law permitted each of the leagues to pool their separate broadcasting rights for sale to a single purchaser. This broadcast antitrust exemption has succeeded in providing the financial foundation for every team in each of the leagues. In the case of the NFL, the Act allowed the league's 30 teams to divide equally $1.2 billion in the 1995-1996 season.

In 1966, arguing that competition between the NFL and the American Football League (`AFL') was undermining the stability of teams in both leagues, the NFL approached Congress again seeking special protection under the law: an antitrust exemption to permit the NFL and the AFL to merge. In testimony before Congress, then-NFL commissioner Pete Rozelle argued forcefully for the merger, saying that if it were approved:

Professional football operations will be preserved in the 23 cities and 25 stadiums where

| Full Display | | Related Information | |
|---|---|---|---|
| PDF | Printer Friendly Display | Bill Summary and Status | Full Text of Bill |

# I. MANDATORY EXPANSION IS INAPPROPRIATE AND UNPRECEDENTED

Section 4(a) of H.R. 2740 provides that in the event of a franchise relocation `the league shall grant to an investor [selected by the community] * * * a new expansion * * * franchise.' In essence, this provision would force professional sports leagues to expand into all communities from which a team has relocated, whether or not the community is able to support a franchise economically or the relocation otherwise complied with the federally-mandated relocation criteria.

Such forced expansion would threaten the financial stability of the sports leagues and clubs. Expansion of a sports league does not ordinarily produce additional net revenues for league members in the long run, even if a substantial expansion fee is paid up front.3

P. 7, 3-11

[Footnote] Instead such expansion can dilute each member's share of shared revenue sources and jeopardize the ability of lower revenue clubs to field competitive teams. As the gulf between clubs widens, attendance could well decline, and with attendance, revenues. Such a circumstance would increase the pressure on clubs to relocate--a result completely contrary to that sought by the authors of the legislation.

[Footnote] 3For example, in connection with the most recent NFL expansion, although each NFL team will receive $10 million in expansion payments over a 4-5 year period, it will forego at least $13.9 million in television payments in the first seven years alone. A similar dilution occurs with regard to team revenues from licensing and marketing. See Letter from Paul Tagliabue, Commissioner, National Football League, to the Hon. Arlen Specter (December 8, 1995).

The Congressional Budget Office agrees that mandated expansion would reduce the revenues available to existing teams, concluding:

| Full Display | | Related Information | |
|---|---|---|---|
| PDF | Printer Friendly Display | Bill Summary and Status | Full Text of Bill |

# II. UNNECESSARY INTERVENTION INTO SPORTS CONTRACTING ARRANGEMENTS

We also have serious concerns with section 6 of the legislation, which would require a professional sport franchise that moves from one facility to another to reimburse the state or local government for any `financial assistance' if the move were in breach of a lease with that entity.

This provision constitutes an unnecessary and unwarranted federal intervention into the domain of contract law. Our hearings disclosed no instance where a professional sports team breached a lease with a state or local government. Moreover, state and local governments can and do protect themselves from the prospect of such breaches by including liquidated damages or specific performance provisions in the contract.[8]

[Footnote]

[Footnote] 8For example, the stadium lease signed between the Oilers and Nashville, TN has been described as `ironclad' and provides that if the team seeks to break the lease, they will be legally obligated to pay the city (i) $117 million if they break the lease in the first 12 years; (ii) $87 million if they break the lease in the following 10 years; (iii) $34 million if they break the lease in the following 8 years; (iv) and $15 million if they break the lease in the following 10-year extension. The lease also allows the city to seek an injunction barring any move. See Trebor Banstetter, Nashville's lease deal among NFL's toughest, Nashville Banner, April 17, 1996, et al.

Moreover, even in the absence of an explicit contractual remedy, any stadium landlord would be free to bring an action for breach of contract if the tenant club breached its lease. If successful, the landlord would be entitled to recover all its actual and consequential damages--not an artificially imposed reimbursement for all `financial assistance' rendered, regardless of when the asserted assistance was rendered. No

| Full Display | | Related Information | |
|---|---|---|---|
| PDF | Printer Friendly Display | Bill Summary and Status | Full Text of Bill |

public policy consideration warrants such unusual remedies when traditional damages-- and in many cases liquidated damages--are available to interested government parties.

Finally, the term `financial assistance' is so vague that it could be interpreted to require compensation for all services (including police protection) for all time (not even limited to the period of the lease). Therefore, in addition to being discriminatory, this provision could prove to be extraordinarily punitive.

For all of the foregoing reasons, we respectfully dissent from H.R. 2740. Although we support efforts to bring fairness and equity to the issue of sports franchise relocations, we cannot endorse legislation which co-opts private financial arrangements and exacerbates the financial problems that lead to the relocations that the sponsors of the bill would like to prevent.

John Conyers, Jr.

Zoe Lofgren.

Stephen E. Buyer.

Ed Bryant.


That NFL policy also provides a procedural mechanism for consideration of franchise relocations. However, these procedural mechanisms apply only to the subject team and other League members. The policy does not allow the affected communities any participation in the process. H.R. 2740 requires notice to the communities and two public hearings. To the Committee's knowledge, no court has ever reviewed this policy to determine whether it would violate the antitrust laws.

Contents Display

# VIOLATED STATUTES & THEIR PURPOSES

**SHERMAN ACT:**

The basic antitrust statute prohibiting any unreasonable interference,

conspiracy, or restraint of trade, with respect to interstate commerce and trade.

**CALIFORNIA UNFAIR COMPETITION LAW (SB 122):**

Under the California Business and Professions Code, any person acting for itself, its members,

or the general public, is entitled to initiate an action for restitution and injunctive relief against

persons or a business entity who knowingly engaged in unlawful, unfair, fraudulent business

practices; any deceptive, untrue or misleading, or prohibitive acts where a corporation's

messages made representations of fact about their own business operations for the purpose of

promoting sales of their services or products to the public; these commercial speech promotions

are regulated by California's Unfair Competition Law SB 122.

**FEDERAL UNFAIR COMPETITION LAW LANHAM ACT 43(a) 1125:**

A person or corporation may be held liable if he uses any word, term, name symbol, or device or

any false or misleading description of fact, or false or misleading representation of fact, which:

(A) In advertising or promotion is likely to cause confusion, mistake, deceive, or (B) misrepre-

sents the nature, characteristics, qualities, or geographic origin of his or someone else's goods

Or services.

**CALIFORNIA LEGAL REMEDIES ACT (CLRA):**

Prohibits vagueness, unfair business practices and deception by declaring unlawful "methods of

competition and unfair" and unfair or deceptive acts or practices undertaken by any person or

corporation in a transaction intended to result or which results in the sale or lease of goods or

services to any consumer (California Civil Code 1770).

## PER SE VIOLATIONS:

Per Se (negligent per se), is the legal doctrine whereby certain acts are considered intrinsically negligent. This occurs when a person (or corporation's) violation of a statute or regulation causes the kind of harm the statute was intending to prevent.

## FEDERAL TRADE COMMISSION ACT OF 1914:

Prohibits unfair methods, acts and practices of competition in interstate commerce. The Federal Trade Commission's function is to counter deceptive acts, practices, and anti-competitive behavior by businesses. The FTC enforces the Federal Trade Commission Act, antitrust, consumer-protection laws, and the Clayton Act, which is the jurisdiction this civil suit falls under—specifically the Clayton Act Tolling by Fraudulent Concealment statute.

## CIVIL TORT CONSPIRACY VS. THE SHERMAN ACT

A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage. A bare agreement among two or more persons—NFL commissioner Pete Rozelle, NFL owners—to harm a third person—plaintiff/ plaintiff class (people of the state of California)—cannot injure the latter unless acts are actually performed pursuant to an agreement (that none of the 23 teams would move from their traditional cities and 25 stadiums, and that 50,000 seat stadiums were adequate for professional football's needs. Therefore it is the ACTS DONE and NOT THE CONSPIRACY TO DO THEM which should be regarded as the essence of the civil action (Allied Equipment Corp. v. Litton Saudi Arabia Ltd., supra, 7 Cal. 4th at 510-11.). The statements of NFL commissioner Pete Rozelle in lying to Congress and the subsequent illegal team movements of NFL franchises beginning in 1971, irreparably harmed the plaintiff/plaintiff class and further injured them

-13-

intentionally per se when the Los Angeles Rams were allowed to leave the state of California in 1995 without any community opinion from fans, who were affected psychologically from the systematic "franchise rape" of their favorite teams. Reiterating once again with the illegal team movements commencing in 1971; the plaintiff/plaintiffs' "fear factor" of California's professional football franchises relocating illegally became a conscious reality in 1984 when the Oakland Raiders' owner, Al Davis engaged in what the plaintiff believes was a "sham litigation" court conspiracy with the National Football League. The league franchise owners, after doing their "dirty work" (illegal franchise moves), voted 22-0 in favor of not allowing Al Davis' Raiders to relocate his team to another part of the state. As part of this ploy, he countered and claimed that the NFL illegally restrained trade (antitrust violation) involving his team saying that the League and the owners were "separate legal entities" capable of conspiring with each other—a chapter 1 & 3 Sherman Act Prohibition. The jury bit on this fraudulent misinformation and judged in favor of the Oakland Raiders. The judgement technically gave the NFL "separate legal entity" status, which would alleviate antitrust liability off of the League itself and only on the franchise owners who actually relocated their teams illegally if a civil suit like this one arose in the future. The truth is—and rufuting the Supreme Court's doctrine—the National Football League as a corporation and their subsidiaries—franchise team owners—as a single entity did conspire to blackmail the 23 initial cities that had franchises in 1966 and restrain trade in the marketing of professional football in those geographic locations until the owners got the type of stadiums they wanted at taxpayers' expense, going against Commissioner Rozelle's promise to Congress that no team movements would occur, and that 50,000 seat stadiums were sufficient for professional football's needs. See NFL policy paragraph no community participation in case of franchise relocations, and Supreme Court doctrine (single entity, next page).

That NFL policy also provides a procedural mechanism for consideration of franchise relocations. However, these procedural mechanisms apply only to the subject team and other League members. The policy does not allow the affected communities any participation in the process. H.R. 2740 requires notice to the communities and two public hearings. To the Committee's knowledge, no court has ever reviewed this policy to determine whether it would violate the antitrust laws.

This civil suit is being adjudicated in federal court for what the plaintiff alleges as gross violations of the Sherman Act, which prohibits conspiracies, as well as a civil tort conspiracy prosecuting counsel, the judge, and jury are to be made aware of. The United States Supreme court—as evidenced on the following page of this civil suit—has defined the National Football League as a single entity, and then contradicted their doctrine otherwise, for antitrust purposes. The plaintiff/plaintiff class in this case plead for the severest penalties as a result of the offenses that were committed against them as manifested by the actual ACTS DONE (CIVIL TORT CONSPIRACY), and a conspiracy to do them (SHERMAN ACT), where the court will be provided proof that as a corporation and their subsidiaries. the National Football League/ franchise owners/NFL Properties etc., (single entity), did violate precepts concerning conspiracies in the Sherman Act; (See "The Smoking Pigskin," Oakland Raiders/NFL Properties Vs. John Vella. The third part of this civil suit, which involves a fraudulent trademark and the defendants the NFL, Oakland Raiders, NFL Properties, NFL Films, and Reebok Inc., relate to the marketing of a fraudulent Raider NFL trademark the League knows has been "misdescriptively deceptive" since the AFL Oakland Raiders merged with the National Football League in 1966, and is being marketed by the aforementioned subsidiaries. Under the Lanham Act and the Federal Trade Commission, which govern trademarks and unfair business practices, a plaintiff needs only to prove that a trademark shows the likelihood of deception, which the plaintiff will produce as evidence in a bench trial. Illinois District Judge J. Moran in a case on the following page, has ruled that the NFL, their subsidiaries NFL Properties, the 32 league teams, as well as Reebok Inc., does business as a single entity under the Sherman Act along with the United States Supreme court's affirmation/denial. As mentioned, the plaintiff will prove that a Sherman Act violation did take place-- Oakland Raiders/NFL Properties vs. John Vella.

-15-

## THE SUPREME COURT'S DECISION ON WHETHER THE NATIONAL FOOTBALL LEAGUE IS OR IS NOT A SINGLE ENTITY FOR PURPOSES OF THE ANTITRUST EXEMPTION AND SHERMAN ACT

As concerning whether the National Football League is or is not a single entity, the Supreme Court took a stance on the issue and decided that the League is not a single entity for purposes of the antitrust exemption for multiemployer collective bargaining. (Brown vs. Pro Football Inc.)----U.S.----1996 U.S. Lexis 4047 (June 20, 1996).

Reciprocally, in a civil suit filed by American Needle Incorporated vs. New Orleans Louisiana Saints, the Court held that licensing coordination between the National Football League and its teams was equivalent to coordination between a corporation and its wholly-owned subsidiary and claimed that because the Supreme Court treats corporations and their wholly owned subsidiaries as single entities, and that there could be no conspiracy and antitrust violation. (See following page exhibit A. & B.) The plaintiff/plaintiffs in this case entreat the court to take notice of the Court's double standard for antitrust/Sherman Act purposes and treat the civil tort offenses that were perpetrated (ACTUAL ACTS DONE), as antitrust violations of chapter 1 and 3 of the Sherman Act; there is no overwhelming evidence where the Court can prove beyond a reasonable doubt that a conspiracy and antitrust violation cannot occur where a single entity corporation along with its subsidiaries performs unlawful business practices to accomplish a means to an end in commerce and trade.

## EXHIBIT A.

### SUPREME COURT STATING NFL IS NOT A SINGLE ENTITY ←

Since the Committee ordered H.R. 2740 reported, the Supreme Court has held that the NFL is not a single entity for purposes of the antitrust exemption for multiemployer collective bargaining. *Brown* v. *Pro Football, Inc.*, ---- U.S. ----, 1996 U.S. Lexis 4047 (June 20, 1996). In making this decision, the Court made the following comments in dicta:

We concede that the clubs that make up a professional sports league are not completely independent economic competitors, as they depend upon a degree of cooperation for economic survival. In the present context, however, that circumstance makes the league more like a single bargaining employer, which analogy seems irrelevant to the legal issue before us.

## EXHIBIT B.

### SUPREME COURT STATING NFL IS A SINGLE ENTITY ←

### NFL is Single Entity for Sherman Act Purposes

*Am. Needle, Inc. v. New Orleans Louisiana Saints,*
11, 2007) (Moran, J.).

Judge Moran granted defendants, the NFL, NFL Properties and each of the thirty two teams (collectively the "NFL") as well as Reebok International, Ltd. ("Reebok"), summary judgment on plaintiff's Sherman Act antitrust claims, finding that the NFL acts through NFL Properties as a single entity for IP licensing purposes. For more than twenty years, NFL Properties licensed plaintiff to use various trademarks on its headwear. Plaintiff filed this suit after NFL Properties entered an exclusive license with Reebok, ending plaintiff's license rights. Plaintiff argued that the NFL teams collectively, as well as in concert with Reebok, violated the antitrust laws by acting together through NFL Properties to license their collective intellectual property rights exclusively to Reebok (plaintiff argued that the NFL did not violate antitrust laws when it licensed to numerous parties, including plaintiff, through NFL Properties). But the Court held that licensing coordination between the NFL and its teams was equivalent to coordination between a corporation and its wholly-owned subsidiary. Because the Supreme Court treats corporations and their wholly-owned subsidiaries as single entities, there could be no conspiracy and no antitrust violation.

-17-

# SPORTING GOODS
# INTELLIGENCE

## LEGAL

**NFL PROPERTIES** has filed a nine-count complaint against John Vella, a former offensive lineman for the Oakland Raiders who currently operates four Raiders Locker Room stores in the San Francisco market. The complaint, filed in U.S. District Court for the Northern District of CA on Feb. 28, charges Vella with trademark infringement, trademark counterfeiting and unfair competition for selling unauthorized Raider gear.

### SUBSCRIPTION INFORMATION

*Sporting Goods Intelligence* is available only by subscription. *SGI* is published 50 times per year, weekly except in December and July.

**PRICING**

| 50 issues - one year | U.S. | Foreign |
|---|---|---|
| Via First Class Mail | $535 | US$575 |
| Via E-mail | 495 | US$495 |
| Via E-mail & Mail | 545 | US$585 |
| Via Fax | 630 | Call |
| Via Fax & Mail | 680 | Call |

*SGI NewsWire* daily e-mail news feed is free to all subscribers. E-mail us and we'll put you on the list.

We appreciate payment with order but will invoice you. Foreign mail service is via Airmail. We accept payment only by wire, credit card or check drawn on a U.S. bank.

*Sporting Goods Intelligence* is published by SportBuyer.com, Inc., 1380 Wilmington Pike, West Chester, PA 19382-8264.

All material is strictly confidential and worldwide copyrights are reserved.

CALENDAR CLERK: MONICA TUTSON
SF COURTROOM 11, 19TH FLOOR

**Contacts:** Tony Vella
General Manager, RLR
**650-302-7779**
John Vella
Owner, RLR
**510-727-0750**

## Raiders and Former ~~Tackle Vella Reach Settlement~~

(415) 522-2123

**Castro Valley, CA (April 24th, 2003)** - - Federal Judge Martin Jenkins approved a settlement today between the Oakland Raiders, in conjunction with the NFL Properties, and John Vella's Raider Locker Room (RLR) of Castro Valley, CA. This resulted from a lawsuit filed February 28th, claiming trademark infringement and the selling of unlicensed, infringing or counterfeit merchandise.

Under the terms of the settlement, RLR agreed remove the "Raider Shield Logo" and the name "Raider" from the store signage and all other media, and continue business under the name, Vella's Locker Room. In addition, Vella will be forced to assist in transferring his domain name, raiderlockerroom.com, to the NFL Properties. The retail chain will continue its online business under the domain name, vellaslockerroom.com. Vella also agreed to cease use of his toll-free phone number, 1-888-77-RAIDER (1-888-777-2433), by a future date at which point incoming calls will be transferred to their new toll free number, 1-866-JVELLAS. One part of the settlement - - removing all infringing merchandise from the stores - - was a moot point in the negotiations, as the RLR had removed all questionable merchandise as of February 28th, the first day they were made aware of the lawsuit. The amount of questionable merchandise was minimal, and the RLR had been requesting an opportunity to discuss the parameters of legal merchandise with NFL Properties months prior to the lawsuit.

The lawsuit did come after an attempt at reconciliation. During the past year, Vella and the team met periodically to discuss possible business opportunities. Team management discussed merger and royalty scenarios and team owner, Al Davis, personally suggested employment as an alternative option during a phone conversation. However, the Raiders failed to put one serious offer on the table along any of those lines, and instead, forced Vella into litigation. Vella, who was unwilling to battle the Raiders or the NFL in court for financial and principal reasons, agreed to settle a lawsuit filled with fallacies, for fear of being dragged into a financial morass.

Vella, who played right tackle for the Raiders from 1972 to 1979 and was part of the Super Bowl XI Championship team, started his business in 1987 with one store in Castro Valley, CA. At the time, the Raiders played in Los Angeles. He had a novel idea – create a retail store that would sell only Raider gear, novelties and collectibles catering to the die-hard fan that he remembered from his playing days. He quickly realized he had found a niche and when the Raiders returned to Oakland in 1995, his business boomed. Over 16 years, Vella has grown his business to 4 stores, expanding to the Bay Area cities of Fremont, Pleasant Hill and Milpitas. Vella has also created an online Web site and currently in discussions to open another store.

**(more)**

# SHERMAN ACT
# CONSPIRACY
# VIOLATION
## "THE SMOKING PIGSKIN"

OAKLAND RAIDERS/NFL PROPERTIES

# VS.

# JOHN VELLA

## CONTINUED

For 14 years, Vella was virtually left alone by NFL Properties. During this time, members of the Raider organization were well aware of Vella's business but had no significant problems or objections to Vella and his stores. Only since the resurrection of the Oakland Raider's retail outlets, The Raider Image, two years ago, has there been strain between the former player and his team. The RLR stands as the largest competitor to the Raider Image chain that has 9 locations plus an ecommerce Website.

Since 1987, the RLR has been committed to the Raider faithful. The company prides itself on having the most and best authentic Raider merchandise and catering to the die-hard Raider fanatic. They frequently hold autograph signings with current and past Raider players to allow their customers to meet their football heroes. They organize group trips to Raider away games, including a trip to Super Bowl XXXVII. Vella believes in his business and will continue to provide quality service and merchandise to fans for years to come.

### # # #

The plaintiff representing the "plaintiff class" refutes the Supreme Court's decision with the following evidence:

> THE "SMOKING PIGSKIN": PROOF OF AN ANTITRUST VIOLATION
> UNDER THE "SINGLE ENTITY" DOCTRINE OF THE (SUPREME COURT)
> --OAKLAND RAIDERS/NFL PROPERTIES VS. JOHN VELLA, FEB 28, 2003;
> U.S. DISTRICT COURT FOR NORTHERN DISTRICT OF CALIFORNIA;
> CONTRACT OR CONSPIRACY IN THE RESTRAINT OF TRADE.
> SPORTING GOODS INTELLIGENCE REPORT JAN/FEB. 2003.

This case resulted from a federal lawsuit filed on Feb. 28, 2003 in which the Oakland Raiders and NFL Properties together claimed trademark infringement and the SELLING OF COUNTERFEIT RAIDER MERCHANDISE. Under the terms of the settlement, John Vella's Raider Locker Room (RLR) agreed to remove the "Raider Shield Logo" and the name "Raider" from his 4 stores where he sold official "Oakland Raider" gear, beginning in 1987. Mr. Vella, who played right tackle for the Oakland Raiders from 1972-1979, was part of the Super Bowl XI (1976) Championship Oakland Raiders football team. After retiring with the Raiders eight years later, he came up with a novel idea—create a retail store that would sell only "official Oakland Raider gear," novelties, and collectibles catering to the die-hard Oakland Raider fan that he remembered from his playing days. He quickly realized when he opened his first store in 1987 that he had found a niche. 3 other stores would eventually expand to the Bay Area cities of Fremont, Pleasant Hill, and Milpitas, California. Mr. Vella also created an on-line web site and was ready to open another store when suddenly after 14 years of doing business with "die hard" Oakland Raider fans, which the National Football League and their subsidiaries knew had been going on, including Al Davis, the owner and general managing partner of the Oakland Raiders, he along with NFL Properties filed a lawsuit against one of his loyal former players in an attempt  contract or conspiracy to restrain trade or prevent Mr. Vella from making an honest living doing what he loved most, which was marketing his former team with a business of his

own. The report states that once the success of Mr. Vella's business was realized and the

amount of business it generated, Oakland Raider management deceitfully discussed merger and

royalty scenarios with him. In the Sporting Goods Intelligence Report it states that owner

Al Davis even suggested employment AS AN ALTERNATIVE OPTION DURING A PHONE

CONVERSATION. However, along those lines, the Oakland Raiders failed to put one serious

offer on the table, and instead, in a cold act, forced Mr. Vella into litigation. Mr. Vella, the

report states, was unwilling to battle the Raiders or the NFL in court for financial and principal

reasons, agreed to settle a lawsuit filled with fallacies, for fear of being dragged into a financial

morass. The report stated that any so-called COUNTERFEIT MATERIAL was minimal and that

Raider Locker Room—Mr. Vella's business—had been requesting an opportunity to discuss the

parameters of legal merchandise with     NFL Properties MONTHS PRIOR TO THE

LAWSUIT. The "Raider Image," a retail outlet ran by the Oakland Raiders, subsequently began

doing buisiness with the public in the same fashion as Mr. Vella's former business Raider

Locker Room. Since this lawsuit, the plaintiff/West Coast Sports & Entertainment has applied

for and was granted a reproduced unregistered trademark of the original Oakland Raider

trademark in March of 2005. Plaintiff claims that the original  Oakland Raider trademark is

literally false "on the face," generic, and was obtained by fraudulent means on the principal

trademark register and violates the Lanham Act 43(a) 15 USC 1125 A&B; 15 USC 1052 A&E;

15 USC 1064 paragraph 3; meets the 2 requirements for being deceptively misdiscriptive; has an

element within the mark that meets the qualification as a connotation: meaning obvious, direct,

and immediate within the trademark itself—referring to the slit on the left side of the Raider's

face (which does not give him vision). The right side of his face has a

patch covering what is supposedly an eye. The secondary meaning of a Raider is:  Webster's

Collegiate Dictionary: A: One that raids and B: A soldier specially trained for close-range fighting. The mark's character, quality, and nature is deceptive, as it does not portray a true "raider" in his "trade dress" portrayal of a raider who is awake, alert, and battle ready. The original mark's "trade dress" or total image is misdiscriptive of the character, quality, and nature of a true living, awake raider. The amended 1988 version of Lanham Act, specifically 43(a), prohibits any use of a false or misleading description or representation in commercial advertising or promotion that "misrepresents the nature, characteristics, qualities of goods, services, and commercial activities. The plaintiff alleges that along with the National Football League's fraudulent business activites, they have known since the original Oakland Raider trademark was fraudulently introduced into U.S. commerce and trade that it is literally false or "false on the face". The defendant's claim that the plaintiff John Vella was selling counterfeit Raider merchandise after his business was successful and was marketed for 14 years with the Oakland Raiders, the National Football League, and NFL Properties knowledge uninterrupted , raises a red flag that they have known all these years that their mark isn't what they claim it is. The courts have formulated the following elements for a claim under a Lanham Act 43(a) complaint which are: 1). The defendant made a false or misleading statement of fact (that their generic mark is a raider) in advertising. 2). The mark actually deceives and has the capacity to deceive a substantial segment of the audience. 3). The deception is material and that its falseness is likely to influence a purchasing decision. 4). The defendants the Oakland Raiders and the National Football League caused the goods (mark) to enter interstate commerce and 5). The plaintiff was injured as a result of fraudulent misrepresentation the NFL allowed by deceptively marketing the mark, and misrepresenting their business activities to the public. The test for misdiscriptiveness has two parts (15 USC 1052 A & E). PART 1). THE MATTER IN THE

-24-

MARK (NO VISION) OR SLIT, ALONG WITH PATCH COVERING OTHER EYE misdescribes the character, quality, and nature of a raider; and PART 2). PEOPLE ARE LIKELY TO BELIEVE THIS MISREPRESENTATION AS BEING AUTHENTIC OF A RAIDER. PART 3). THE MISREPRESENTATION, ONCE KNOWN, WOULD MATERIALLY AFFECT THE DECISION TO PURCHASE THE GOODS. As the mark has been described by the plaintiff as being asleep, it qualifies as a "generic" trademark under 15 USC 1064 (paragraph 3)—At any time if the registered mark becomes the generic name for the goods, or a portion thereof for which it is registered, or is functional, or has been abandoned, or its registration was obtained fraudulently, or if the mark becomes the generic name (sleeper) for less than all of the goods in connection with which the mark is used, a petition to cancel the registration for only those goods may be filed. The Federal Trade Commission may apply to cancel on the grounds specified in paragraphs 3 and 5 of 15 USC 1064 any registered mark on the principal register established by this chapter, and the prescribed fee shall not be required (308.02 (c)) PETITION FILED BY THE FEDERAL TRADE COMMISSION. Deceptively misdiscriptive marks convey an immediate false idea of an ingredient or element ( a deceptive slit instead of an eye), quality, characteristic, function, or feature of the goods with which it is used. Prospective purchasers that encounter the mark, as used on or in connection with the goods in question, would likely believe the misrepresentation. The plaintiff alleges false advertising and petitions this court for a temporary restraining order that the Oakland Raiders no longer advertise their mark on their helmets until discovery is produced by evidence (Lanham Act) prior to a  permanent injunction proving false advertising on behalf of the Oakland Raiders and their subsidiaries the National Football League, Reebok, NFL Properties, and NFL Films in television coverage, print ads, commercials, and merchandise.

# Q: Raiders logo? SLEEPER, SLUMBERER,

The Oakland Raiders
Real Men Wear Black! Buy Official Raiders Merchandise
www.RaiderImage.com

Ads by Google

**This Question Has Not Been Answered Yet**

**Be the first!**
Help answer this question.



 Answer "What is the symbolism of the Oakland Raiders logo?"
Even if you can't offer a complete answer, help us get things started.

 Research your answer:

Search

 Send this question to a friend.

Watch this question and be alerted when it's answered.

**Noun 1.** **sleep** - a natural and periodic state of rest during which consciousness of the world is suspended; "he didn't get enough sleep last night"; "calm as a child in dreamless slumber"

slumber

sleeping - the state of being asleep

nonrapid eye movement, nonrapid eye movement sleep, NREM, NREM sleep, orthodox sleep - a recurring sleep state during which rapid eye movements do not occur and dreaming does not



**2. sleep** - a torpid state resembling deep sleep

sopor

physical condition, physiological condition, physiological state - the condition or state of the body or bodily functions

**3. sleep** - a period of time spent sleeping; "he felt better after a little sleep"; "there wasn't time for a nap"

nap

period, period of time, time period - an amount of time; "a time period of 30 years"; "hastened the period of time of his recovery"; "Picasso's blue period"

beauty sleep - sleep before midnight

kip - sleep; "roused him from his kip"

**4. sleep** - euphemisms for death (based on an analogy between lying in a bed and in a tomb); "she was laid to rest beside her husband"; "they had to put their family pet to sleep"

eternal rest, eternal sleep, ~~~ ~~~est

death - the absence of life ~~~ ~~~eir

content in death than he ha~~~

**Verb 1. sleep** - be asleep

catch some Z's, kip, log Z's, slumber

rest - be at rest

practice bundling. bundle - sleep fully one's betrothed

catch a wink, catnap, nap - take a sies~~~ lunch for an hour"

sleep in, sleep late - sleep later than us~~~ I sleep in"

hibernate, hole up - sleep during winter~~~ ~~~d before they hibernate in their cave~~~

aestivate, estivate - sleep dur~~~

sleep in, sleep late - sleep later than usual o~~~ I sleep in"

live in, sleep in - live in the house where one works; "our babysitter lives in, as it is too far to commute for her"

sleep in, sleep late - sleep later than usual or customary; "On Sundays, I sleep in"

sleep out, live out - work in a house where one does not live; "our cook lives out; he can easily commute from his home"

wake - be awake, be alert, be there

**2. sleep** - be able to accommodate for sleeping; "This tent sleeps six people"

accommodate, admit, hold - have room for; hold without crowding; "This hotel can accommodate 250 guests"; "The theater admits 300 people"; "The auditorium can't hold more than 500 people"



( S L E E P E R ) 15 USC 1064 PARAGRAPH

3

ORIGINAL

"DECEPTIVE"

TRADEMARK

12/15/2007

Go to Previous

# 3. Deception and confusion as a result of a connotation within a trade mark

For a trade mark to fall foul of <u>section 43</u> there must be some connotation within the trade mark that would reasonably be expected to cause deception or confusion in the mind of the relevant buying public. For example, deception or confusion could arise in regard to:

- Character of the goods and/or services including their composition, nature or other properties

- Quality or quantity of the goods and/or services

- Geographical origin of the goods and/or services

- Intended use or purpose of the goods and/or services

- Connection in the mind of the buying public with a person or organisation.

However, the mere presence within a trade mark of a person's name, a descriptive term, a geographical place name or a reference to the size of packages or intended use of a product does not automatically demonstrate a connotation sufficient to invoke <u>section 43</u>. The prominence and context of the potentially deceptive or confusing element in the trade mark will be important in deciding whether the trade mark "is likely to deceive or cause confusion". For a ground for rejection to be raised the connotation must be obvious, direct, and immediate and within the trade mark itself. Importantly it must be judged as giving rise to deception and/or confusion.

## 3.1 The connotation must be obvious and direct.

There must be a real and obvious danger of the buying public being deceived and/or confused by the secondary meaning within the mark. A possibility of confusion or a suggestion that deception might occur is not sufficient. The tests lie in the perception of the ordinary person, as noted by Kitto J in *Southern Cross Refrigerating Co v Toowoomba Foundry Pty Ltd* (1954) 91 CLR 592 at 594-5, referred to with approval by French J in the *Woolworths Metro* case, *Registrar of Trade Marks v Woolworths* 45 IPR 411:

> *(ii) It is not necessary, in order to find that a trade mark offends against the section, to prove that there is an actual probability of deception.... **While a mere possibility of confusion is not enough - for there must be a real, tangible danger of its occurring...** - it is sufficient if the result of the user of the mark will be that a number of persons will be caused to wonder.... **It is enough if the ordinary person entertains a reasonable doubt.** (iii) In considering the probability of deception, all the surrounding circumstances have to be taken into*
> *consideration. (This in*

### De facto secondary meaning

The LITE beer case is an example of de facto secondary meaning.[70] The term LITE, through massive advertising by Miller, had achieved public recognition as a trademark. Nevertheless, LITE was found generic and unprotectable for low-calorie, low-alcohol beer. This finding was based on dictionary definitions, industry practice, and state statutory references to low-alcohol beer as "light." LITE was viewed as the equivalent of LIGHT.

In refusing to protect generic terms or functional shapes that have a de facto secondary meaning, trademark law recognizes that the public interest in protection from confusion may have to give way to the paramount public interest of permitting competitors to inform the public of the nature of their goods.

(1) COUNTERFEIT, ASLEEP, DEAD, COMATOSE

(2) AUTHENTIC RAIDER

#1 #1 #1

LITE BEER

ASLEEP RAIDER

DEFENDANT'S COUNTERFEIT RAIDER MARK (1)

GENERIC



Miller Brewing C... 1977), cert... F.2d 75 (7th Cir.

(1)

The motivation test for genericness was finally put to rest by congressional legislation.[67] In 1984, the Lanham Act was amended to state:

> A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service. The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used.[68]

### § 5:3.2 When Purchaser Association Won't Help: De Facto Secondary Meaning

There are a few situations where proper use, diligent policing, and favorable survey results will not carry the day. Where a term is generic from the outset or the product design is functional, proper use, massive advertising, and consumer association will not produce exclusive rights. The situation is known as "de facto secondary meaning": Consumers in fact perceive the symbol as a brand name, but an overriding public policy preserves the right to copy:

> [A]s to some words and shapes the courts will never apply the "secondary meaning" doctrine so as to create monopoly rights. The true basis of such holdings is not that they cannot or do not indicate source to the purchasing public but that there is an overriding public policy of preventing their monopolization, of preserving the public right to copy.[69]



(2)

PLAINTIFF'S
BATTLE
READY
MARK (2)

---

67. The motivation theory for assessing secondary meaning was also given short shrift in *Warner Bros. v. Gay Toys, Inc.*, 724 F.2d 327, 333–34 (2d Cir. 1983). The court noted that the Rolls Royce RR symbol was associated with a single source regardless of the reasons people bought Rolls Royce automobiles.

68. 15 U.S.C. § 1064(c).

69. *In re* Deister Concentrator Co., 289 F.2d 496, 504 (C.C.P.A. 1961).

1. Registration Number: VAu-689-097
Title: Oakland Raider.
Description: Drawing.
Claimant: acDavid R. Flood , 1961-
Created: 2000
Registered: 2Sep05     *(MY VERSION)* AWAKE     *(ORIGINAL VERSION)*
Title on © Application: Oakland Raider (battle ready-weapons raised); Oakland Raider
(asleep-weapons lowered) CHARACTER, QUALITY, FUNCTION
Previous Related Version: Appl. states work based on preexisting logo.
Claim Limit: NEW MATTER: additional artwork     ↓  ↓  ↓  ↓  ↓  ↓
Special Codes: 5/S
                    YOU CAN'T BE A RAIDER IF: ASLEEP, DEAD, OR IN COMA

Home | Contact Us | Legal Notices | Freedom of Information Act (FOIA) | Library of Congress

U.S. Copyright Office
1C Independence Ave. S.E.
Washington, D.C. 20559-6000
(202) 707-3000

ORIGINAL OAKLAND
RAIDER TRADEMARK →
WHICH HAS STOOD FOR
OVER 40 YEARS.

## Test for Determining if Mark is Deceptive

The usual test for determining
whether or not a mark is
deceptive is:                                    O
                                                 R
1. Whether the mark                              I
   misdescribes the                              G
   character, quality,                           I
   function, composition, or                     N
   use of the underlying                         A
   product. (YES)                                L
2. If yes, then whether the
   prospective purchasers                        O
   are likely to believe that                    A
   the misdescription                            k
   actually describes the                        L
   goods. (YES)                                  A
3. If yes, then whether                          N
   purchasers are likely to                      D
   rely upon the
   misdescription in making               RAIDER
   their purchasing
   decision. (YES)

## Example of a Deceptive Trademark

The trademark BreathAsure
was determined to be
deceptive because it conveyed
the literally false message that
fresh breath was assured by
using the product. Deception
was found because an
essential and material element
was misrepresented, was
distinctly false, and was the
very element upon which the
customer would reasonably
rely in purchasing the product
over another product.

Some courts have simply
looked for an intent to
deceive, instead of applying
the above test.

# TRADE DRESS
## AIDER FOR FREEDOM
### AUTHENTIC



Mar 5, 2:40 PM ET

 Associated Press

t Sgt. John Shannon testifies before a House Oversight and
ernment Reform subcommittee at Walter Reed Medical
ter in Washington, Monday, March 5, 2007, to discuss care
conditions of wounded soldiers at the hospital. (AP
to/Dennis Cook)

# TRADE DRESS
## BATTLE RAIDER
### AUTHENTIC



COMMISSIONED

SEPT.
2005

BATTLE READY
COPYRIGHT ©
VAU 689-097

# TRADE DRESS
## SLEEPER, CATNAPER
### COUNTERFEIT



COMMISSIONED

SEPT.
1963

GENERIC (SLEEPER)
OBTAINED FRAUDULENTLY
15 USC 1064(P.3)
3A 1175(A&B)

The plaintiff also alleges false description, false representation, and trade dress

infringement on behalf of the defendant Oakland Raiders pertaining to their trademark

logo, in comparison to the plaintiff's visibly stronger/authentic unregistered mark.

Lanham Act 43(a) 1125 in this case protects unregistered trademarks from spurious or

counterfeit marks that may have been fraudulently introduced on the principle register and

commerce/trade, and provides the following trademark law statutes for a claimant:

### 15 USC 1125 A & B FALSE DESIGNATIONS OF ORIGIN AND FALSE DESCRIPTIONS/ REPRESENTATIONS FORBIDDEN

(1) Any person who, on or in connection with any goods or services, or container for goods,

uses in commerce any word, term, symbol, or device, or any combination thereof, or any false

designation of origin, false or misleading description of fact, or false, or misleading

representation of fact which, (A) is likely to cause confusion or to cause mistake or to deceive

as to the affiliation, connection, or association of such person with another person—IT IS

STATED THAT THE OAKLAND RAIDERS' TRADEMARK IS MODELED AFTER OR IS

A RENDITION OF RANDOLPH SCOTT, AN ACTOR. …IN EXHIBIT A OF THIS

CIVIL BRIEF EVIDENCE WILL BE PRODUCED THAT RANDOLPH SCOTT DID NOT

APPEAR TO BE ASLEEP, DEAD, OR IN A COMA IN HIS MOVIES (See Captain Kidd and

raider/pirate representations ("the movie industry"). Continuing-- or (B) in commercial

advertising or promotion, misrepresents the nature, characteristics, qualities, or

geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged

by such act.

(3) In a civil action for trade dress infringement, under this act for a trade dress not registered

on the principal register, the person who asserts trade dress protection—the plaintiff—has the

the burden of proving that the matter sought to be protected is not functional. The plaintiff's

unregistered trademark in this case qualifies for protection under Lanham Act 43 (a) 1125—the

federal unfair competition law. The plaintiff's mark is a registered copyright; is non-functional;

and as such, has not been introduced into commerce and trade for marketing. As for the

defendant's mark, IT IS FUNCTIONAL; IT DECEIVES; IT MISREPRESENTS; AND

MISDESCRIBES the nature, character and quality of the goods to which it is affixed to—

meaning the actual product, the professionally paid National Football League football player.

The plaintiff's point is that the players who represent the NFL's 32 teams are "not sleeping" on

the football field come game time as the Oakland Raiders' mascot/representative appears to be

on their trademark. A trade dress of a trademark is functional when the trade dress elements (in

the mark) are essential which belong to the product—pertaining to the nature of a football player;

not one who is sleeping on the football field during a game, OR A SLUMBERER (NOT A

RAIDER)-- WHAT HE SHOULD ACTUALLY BE BY HIS "TOTAL IMAGE TRADE

DRESS"—DURING COMBAT. Plaintiff claims that the defendant's trademark is a de facto

secondary meaning mark, which is a mark that is determined to be generic, functional, and

cannot have exclusive trademark rights, (Trademark Law: A Practicioner's Guide, Siegrun D.

Keene). A functional mark is the opposite of non-functional, as the total image of the elements

within the mark are essential to the product's use and ascribes the nature or quality to the actual

product—the player himself. Again the National Football League's football players are not

sleeping on a football field during a game. The Oakland Raiders' counterfeit, spurious mark

depicts a deceptive character and nature of an actual raider/football player. 15 USC 1052 states

that no trademark by which the goods of the applicant may be distinguished from the goods of

others shall be refused registration on the account of the mark's nature (asleep, weapons down)

-34-

unless (A) It consists of immoral or DECEPTIVE matter or (E) Is DECEPTIVELY

MISDISCRIPTIVE OF THEM. The Oakland Raider is a descriptive trademark that leaves out

an essential element—an eye—that makes it appear to be sleeping, dead, or in a coma, which

substantially decreases the nature, quality and character of what an actual raider/pirate

represents. The remainder of the National Football League's 31 franchise team trademarks are

suggestive marks (see raider/pirate representations ("the movie industry"). In a Lanham Act

civil case the plaintiff needs only to prove the "likelihood of deception," not actual deception.

This plaintiff will prove actual deception is apparent on the face of the defendant's trademark—

literally "false on the face". A statement from Federal Trade Commission Chairman James

Miller III on the Deception Analysis released by commissioners Bailey & Pertschuk (F.T.C.,

February 29, 1984), states the issue is whether the act of deception or practice is likely to mislead

consumers, rather than whether it causes actual deception. Miller, Policy Statement on

Deception, in letter to Representative John Dingell, Oct. 14, 1983, reprinted as appendix to

Cliffdale Associates., 103 F.T.C. 110, 174 (1984) hereinafter as Policy Statement on Deception.

The dissenting commissioners did not dissent on this point: "The Commission need not find that

consumers have actually been misled to hold an act or practice deceptive." Bailey & Pertschuk,

Analysis of the Law of Deception, 46 ANTITRUST & TRADEMARK REG. REP. (BNA) No.

1154 at 372, 378 (March 1, 1984) enclosure letter to Rep. John D. Dingell, Feb. 28, 1984)

hereinafter as Analysis. Plaintiff upon the summation of disclosing Lanham Act statutes

regarding defendant's deceptive mark, hereby summons the Federal Trade Commission—

Secretary of The Commissioner—in a letter/copy of the civil brief of the foregoing litigation, to

proceed with the cancellation of the defendant's spurious mark on the principal register and

notification to the Oakland Raiders, the NFL etc., in the best interests of the consumer.

**Thesaurus**  Legend: ▓Synonyms ▌Related Words ▌Antonyms

RAIDER EYES

Noun 1. **raider** - someone who takes spoils or plunder (as in war)
  ▌despoiler, freebooter, looter, pillager, plunderer, spoiler
  ▌war, warfare - the waging of armed conflict against an enemy; "thousands of people were killed in the war"
  ▌buccaneer, sea robber, sea rover, pirate - someone who robs at sea or plunders the land from the sea without having a commission from any sovereign nation
  ▌stealer, thief - a criminal who takes property belonging to someone else with the intention of keeping it or selling it

2. **raider** - a corporate investor who intends to take over a company by buying a controlling interest in its stock and installing new management
  ▌corporate investor - a company that invests in (acquires control of) other companies

## A.  Origins of "Trade Dress"

"Trade Dress" is a trademark concept. "Trade dress" consists "not of words or symbols, but of a product's packaging (or 'image,' more broadly)." Two Pesos v Taco Cabana, infra, J. Thomas concurring. Trade dress also has been defined as "...a category that originally included only the packaging, or 'dressing,' of a product, but in recent years has been expanded by many courts of appeals to encompass the design of a product." Wal-Mart Stores v Samara Bros., infra.

The basis of trade dress protection is Section 43(a) of the Lanham Act. The original Lanham Act as enacted in 1946 prohibited "false description or representation" of a product by a "person who shall with knowledge of the falsity" place the object in commerce. The 1946 Act did not mention trade dress protection. The courts extended the protections accorded by Section 43(a) to trade dress, essentially creating a federal law of unfair competition.

Section 43(a) was substantially amended in 1988. The purpose of the amendments, according to a Senate report (S. Rep. No. 100-515 (1988)), was to make the act consistent with the case decisions. Amended Section 43(a) appears at 15 USC § 1125(a). That section provides in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce **any word, term, name symbol, or device, or any combination thereof**... **which (A) is likely to cause confusion**, or to cause mistake, or to deceive... as to the origin... of his or her goods, services, or commercial activities... shall be liable in a civil action....



# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America



Form VA
For a Work of the Visual Arts

VAu 689-097

EFFECTIVE DATE OF REGISTRATION

9-2-05

Month    Day    Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

---

**Title of This Work ▼**

OAKLAND RAIDER (BATTLE READY-WEAPONS RAISED)

**NATURE OF THIS WORK ▼ See instructions**

VISUAL ART (REPRODUCTION)

**Previous or Alternative Titles ▼**

OAKLAND RAIDER (ASLEEP-WEAPONS LOWERED)

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. **Title of Collective Work ▼**

If published in a periodical or serial give: **Volume ▼**    **Number ▼**    **Issue Date ▼**    **On Pages ▼**

---

## 2

**NAME OF AUTHOR ▼**

DAVID R. FLOOD

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1961    Year Died ▼

**Was this contribution to the work a "work made for hire"?**
☐ Yes
☒ No

**Author's Nationality or Domicile**
Name of Country
OR Citizen of UNITED STATES
Domiciled in

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**Nature of Authorship** Check appropriate box(es). **See Instructions**
☐ 3-Dimensional sculpture    ☐ Map    ☐ Technical drawing
☒ 2-Dimensional artwork    ☐ Photograph    ☐ Text
Reproduction of work of art    ☐ Jewelry design    ☐ Architectural work

---

**Name of Author ▼**

N/A

**Dates of Birth and Death**
Year Born ▼    Year Died ▼

**Was this contribution to the work a "work made for hire"?**
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR Citizen of
Domiciled in

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**Nature of Authorship** Check appropriate box(es). **See instructions**
☐ 3-Dimensional sculpture    ☐ Map    ☐ Technical drawing
☐ 2-Dimensional artwork    ☐ Photograph    ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design    ☐ Architectural work

---

## 3

**Year in Which Creation of This Work Was Completed**
2000
This information must be given in all cases.

**Date and Nation of First Publication of This Particular Work**
Complete this information ONLY if this work has been published.
Month _____ Day _____ Year _____
Nation

---

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

DAVID FLOOD    915 L. STREET PMB-292
SACRAMENTO, CA. 95814

APPLICATION RECEIVED
SEP 0 2 2005
ONE DEPOSIT RECEIVED
SEP 0 2 2005
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

---

**MORE ON BACK ▶**    • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___ pages

Randolpn Scott - wikipedia, the free encyclopedia

The NFL Oakland Raiders' team emblem of a pirate (or "raider") wearing a football helmet
was created, reportedly a rendition of actor Randolph Scott ...
1 wikipedia.org/wiki/Randolph_Scott - 72k - Cached - Similar pages !

TEAM EMBLEM OF
RANDOLPH SCOTT
APPEARS SLEEP,
DEAD, OR IN COMA



# RANDOLPH SCOTT AS A RAIDER

# OR

# "PIRATE" HAS VISION IN THE MOVIE CAPTAIN KIDD

## EXHIBIT A EVIDENCE, THE MOTION PICTURE INDUSTRY

# HOLLYWOOD MOVIES WHERE "RAIDERS" OR PIRATES HAVE VISION AND ARE NOT ASLEEP, DEAD, OR IN A COMA.

15 USC 1052(a): CONSISTS OF DECEPTIVE MATTER WHICH MAY DISPARAGE OR FALSELY SUGGEST A CONNECTION WITH PERSONS.

# TIME WARNER COMPANY'S
## T-800 ENDOSKELETON
### ALIEN SPACE PIRATE



## TERMINATOR II MOVIE
## PORTRAYED BY ACTOR
## ARNOLD SCHWARZENEGGER

## CAPTAIN KIDD

1945 -- Charles Laughton, Randolph Scott - A pirate double crosses the King of England after making a deal to safeguard a fleet of treasury ships from india.

## STARRING



## RANDOLPH                    SCOTT



Pirates of the
Caribbean: At
World's End



Pirates of the
Caribbean: Dead
Man's Chest



The Black Swan



The Princess
and the Pirate



### Legendary Pirate Movies

**The Son Of Monte Cristo**
1940 // 101 Minutes // Not Rated
**Captain Kidd**
1945 // 81 Minutes // Not Rated
**Long John Silver's Return To Treasure Island**
1954 // 103 Minutes // Not Rated
Released by **BFS Video**
Reviewed by Judge Barrie Maxwell (Retired) // January 24th,
2003

## THE BELOVED ROGUE
1927 (silent) ~ John Barrymore, Conrad Veidt, Marceline Day - The French poet-patriot
Francois Villon enters a battle of wits with King Louis XI and fights to save his beloved in
this exciting and romantic adventure. An enormous production with lavish sets and
costumes. In this swashbuckling story the great John Barrymore truly shows why he was the
best of his silent era.

## THE BLACK PIRATE
1926 (silent) ~ Douglas Fairbanks, Sr. - A nobleman pushed too far by a mob of cuthroats.
Features one of the most famous swordfight scenes ever filmed. Silent with original music
score this is the type of film that made Fairbanks a swashbuckling legend on the screen.

## THE BLACK SWAN
1942 ~ Tyrone Power, Maureen O'Hare, Anthony Quinn - A high-
seas adventure about a dashing pirate intent on rescuing a beautiful
woman. Based on the Sabatini book of the same title.



## BLACKBEARD'S GHOST
1968 ~ Peter Ustinov, Dean Jones, Elsa Lancaster - Fun Disney film
with Peter Ustinov as the infamous Blackbeard.

## BLACKBEARD THE PIRATE
1952 ~ Robert Newton, Linda Darnell, Irene Ryan - Newton is
rambunctious as a 17th century buccaneer, with lovely Darnell his
captive.

## THE BOY AND THE PIRATES
1960 ~ Charles Herbert, Susan Gordon, Murvyn Vye - A young boy is magically transported
back in time to an 18th century pirate ship on the high seas.

## THE BUCCANEER
1938 ~ Frederic March - About Jean Lafitte and the Battle of New Orleans.

## THE BUCCANEER
1958 ~ Yul Brynner - a good remake of the 1938 film.

## CAPTAIN BLOOD
1935 ~ Errol Flynn - A must see classic pirate epic with Flynn starring in his first
swashbuckler. Based on Sabatini's novel of the same name. Dr. Peter Blood is a british
physician unjustly sentenced to slavery for aiding a wounded rebel. Bought by the niece of a
brutal plantation owner, Blood eventually escapes by overtaking a ship. Once on board,
Captain Blood embarks on a series of swashbuckling adventures.

## CAPTAIN HORATIO HORNBLOWER

-43-

## PIRATES OF TORTUGA
1961 ~ Ken Scott, John Richardson - This one is about Sir Henry Morgan's adventures.

## THE PIRATES OF TRIPOLI
1955 ~ Paul Henreid, Patricia Medina.

## PORT SINISTER
1953 ~ James Warren, Lynne Roberts, Paul Cavanagh - More of a 50's low budget sci-fi than a pirate adventure. About the legendary pirate town of Port Royal rising from the sea.



## PRINCE OF PIRATES
1953 ~ John Derek, Barbara Rush, Carla Balenda - A very entertaining pirate film, with an excellent cast.

## THE PRINCESS BRIDE
1987 ~ Peter Falk, Billy Crystal - A story of how Wesley leaves his love 'Buttercup' promising his return, to make his fortune and meets "his end" with the Dread Pirate Roberts.

## QUEEN OF THE PIRATES
1960 ~ Gianna Maria Canale, Massimo Serato, Scilla Gabel - A 16th century sea captain and his daughter escape false charges by running away to become pirates.

## RAGE OF THE BUCCANEERS
1962 ~ Ricardo Montalban, Vincent Price - Standard low budget pirate flick.

## RAIDERS OF THE SEVEN SEAS
1953 ~ John Payne, Donna Reed, Lon Chaney Jr. - A hollywood tale about a pirate named Barbarossa.

## RETURN TO TREASURE ISLAND
1954 ~ Tab Hunter, Dawn Adams - Standard tale.

## RETURN TO TREASURE ISLAND
1985 (6-part mini-series) ~ Brian Blessed, Christopher Guard - Well made Disney pirate adventure which teams Long John Silver with an adult Jim Hawkins.

## SEA DEVILS
1953 ~ Yvonne de Carlo, Rock Hudson - Another standard pirate film.

by Daphne du Maurier about a French pirate.

### THE GOLDEN HAWK
1952 ~ Rhonda Fleming, Sterling Hayden - Based on the book by Frank Yerby.

### HOOK
1991 ~ Dustin Hoffman, Robin Willimas, Bob Hoskins, David
Crosby - An entertaining adventure which has an adult Peter Pan
fighting the evil Hook.

### THE ICE PIRATES
1984 ~ Robert Urich, Mary Crosby, Anjelica Huston - A light hearted
comedy about space pirates.



### ISLAND
1980 ~ Michael Caine - A modern day pirate tale based on the novel by Peter Benchley.

### THE KING'S PIRATE
1967 ~ Doug McClure, Guy Stockwell - A well done remake of "Against All Flags".

### LAST OF THE BUCCANEERS
1951 ~ Paul Henreid, Jack Oakie, Karin Booth - This very good swashbuckler is about the
adventures of Jean Lafitte. Set after he helped to save New Orleans from British invasion
during the war of 1812.

### LONG JOHN SILVER
1954 ~ Robert Newton, Kit Taylor, Connie Gilchrist - Newton does an outstanding job in his
role of the fictional pirate Long John Silver.

### MAGIC ISLAND
1995 ~ Andrew Divoff, Zachery Ty Bryan - A 13-year old discovers a fantastic new world
that lies beyond the pages of a magical book about pirates. Jack gets whisked into the book
itself, and encounters land sharks, beautiful mermaids, duels & danger during his
breathtaking adventure on Magic Island.

### THE MASTER OF BALLANTRAE
1953 ~ Errol Flynn - A classic starring Flynn as a Scottish Lord driven from his family and
homeland then forced to join in with pirates.

### THE MASTER OF BALLANTRAE
1984 ~ Richard Thomas, Michael York, Timothy Dalton - A dismal remake of the 1953
classic.

### MORGAN THE PIRATE
1961 ~ Steve Reeves, Valarie Lagrange, Chelo Alonso - A well-

-45-

1940 ~ Errol Flynn - An exciting adventure drama about an english pirate, who upon learning that the Spanish plan to invade his native England with their armada, rushes back to save Queen and country. Great ship scenes.

### SINBAD THE SAILOR
1947 ~ Douglas Fairbanks Jr, Anthony Quinn, Maureen O'Hara - One of Douglas Fairbanks Jr.'s best films. A lavish Technicolor adventure with an excellent cast that resurrects the exuberance of his father's swashbuckling classics. Has great action sequences.

### SHIPWRECKED
1990 ~ Stian Smestad, Gabriel Byrne - A young Norwegian boy, and a girl stowaway discover that some of their shipmates are actually pirates.

### THE SON OF CAPTAIN BLOOD
1962 ~ Sean Flynn - Errol's son Sean trys his hand in films as a swashbuckler.

### THE SPANISH MAIN
1945 ~ Paul Henreid, Maureen O'Hara - A pirate captain takes on a greedy Spanish governor.

### SWASHBUCKLER
1976 ~ Robert Shaw, James Earl Jones, Peter Boyle - An excellant pirate movie with all the classic thrills.

### THREE LITTLE PIRATES
1946 ~ Moe Howard, Curly Howard, Larry Fine - The usual zany antics are here from these comic masters in this classic short film.

### TREASURE ISLAND
1934 ~ Wallace Beery, Jackie Cooper - First Film Adaptation Of Robert Lewis Stevenson'S Classic 1883 Novel.

### TREASURE ISLAND
1950 ~ Robert Newton - This exciting live action production of the classic Robert Louis Stevenson pirate tale was the best of them all, With Newton magnificent as the infamous treasure seeker Long John Silver. After this movie, Newton continued his role in the Disney TV series.

### TREASURE ISLAND
1972 ~ Orson Welles, Kevin Burfield - Welles portrays Long John Silver in this version of Robert Louis Stevenson's pirate tale.

### TREASURE ISLAND
1990 ~ Charlton Heston, Christian Bale, Oliver Reed, Christopher Lee - This made for TV version is one of the best adaptions of the classic novel.

-46-

Title 18 section 2. (a) Chapter 113 2320 under USE OF COUNTERFEIT MARKS the term

counterfeit means (A) a spurious mark which is used in connection with the sale, offering for

sale, or distribution of goods or services which is identical with, OR SUBSTANTIALLY

INDISTINGUISHABLE from a mark registered for that type of goods or services on the

principle register in the United States Patent and Trademark Office or (B) a spurious

designation which is identical (PLAINTIFF'S MARK IS NOT IDENTICAL WITH

DEFENDANT'S MARK) OR SUBSTANTIALLY INDISTINGUISHABLE FROM--

(PLAINTIFF'S MARK IS SUBSTANTIALLY DISTINGUISHABLE FROM DEFENDANT'S

MARK) which the remedies of the Lanham Act are made available, which the plaintiff owns.

pertaining to the topic listed on the beginning of this page, under the title and chapter section,

states that any property constituting or derived from any proceeds the defendant obtained,

directly or indirectly (from merchandise sales etc.), as a result of introducing and marketing

a counterfeit mark in commerce and trade, warrants the forfeiture of property bearing such

mark, and shall be governed by the procedures set forth in section 413 of (21 U.S.C. 853). The

Court shall order that any forfeited articles, merchandise etc., to be destroyed bearing or

consisting of a counterfeit mark. Any defenses, affirmative defenses, and limitations on

remedies that would be applicable in an action under the Lanham Act shall be applicable in a

prosecution under this section. The plaintiff alleges that the National Football League, NFL

Properties, NFL Films, Reebok Inc., and the Oakland Raiders willfully committed false

advertising under this section and the Lanham Act, and in the process knowingly deceived

millions of fans/consumers during a 46 year time span in the state of California, the fifty

other continental United states, and worldwide marketing the Oakland Raiders' counterfeit/

spurious mark. After the plaintiff conducted an initial research into the National Football

League's business operations prior to the antitrust exemption and merger of the two leagues—the

National Football League with the American Football League—and subsequent Lanham Act

violations that they misrepresented and marketed one of their trademarks by deceit, then

committed a Sherman Act violation prohibiting conspiracies—Oakland Raiders/NFL Properties

vs. John Vella ("The Smoking Pigskin"), it appears to the plaintiff that they believed they were

untouchable; see SHOULD NFL BE IMMUNE TO ANTITRUST LAWS) below:

## Should NFL be immune to antitrust laws?

December 29, 2007 6:00 AM

Like many fans of the undefeated New England Patriots, we welcomed the NFL Network's last-minute decision to open up broadcast rights to tonight's game against the New York Giants.

The National Football League, the organization overseeing the Patriots and 31 other professional teams, said it made the decision to simulcast the game nationally on the CBS and NBC television networks because it cares about the fans; we believe it's possible other motives came into play.

For example, we believe if members of Congress hadn't raised concerns about millions of fans across the country not being able to see the game — a potential sports history moment in the making, as no team has had an undefeated 16-0 regular season — the NFL might have been less concerned about those millions of fans, and certainly not those in northern New England unable to watch on the one designated station out of Boston.

In particular, the NFL took notice of the attention from two legislators in Washington, D.C. — Sen. Patrick Leahy, D-Vt., and Sen. Arlen Specter, R-Pa. — who are members of the powerful Senate Judiciary Committee. For more than a year, they have taken a dim view of what they see as the NFL's attempt to have its cake and sell it as well.

"Now that the NFL is adopting strategies to limit distribution of game programming to their own networks," the pair wrote in a letter to the NFL, "Congress may need to re-examine the need and desirability of their continued exemption from the nation's antitrust laws."

The magic words there are "exemption" and "antitrust laws." The NFL got into trouble before in the 1950s for banding together and selling broadcast rights together, which a federal judge ruled was anti-competitive. The NFL persuaded Congress in 1961 to give limited antitrust exemption to the league under the guise of the Sports Broadcasting Act of 1961. This act allows the NFL to sell the individual broadcast property rights of each team as a group venture — which has proven to be financially beneficial and would be illegal if not for the antitrust (or anti-monopoly) exemption.

# SHOULD THE NFL BE IMMUNE TO ANTITRUST LAWS CONT.

There's no question that the NFL's "all for one, one for all" brew of socialism and capitalism has made it a multi-billion-dollar success story and the leading sports league in the country. But with the NFL Network, one might accuse the league of biting off more than it can legally chew as it is creating and broadcasting games — which walks a very fine antitrust line.

In the 1950s, movie studios were forced to sell off their lucrative ownership of movie theaters throughout the country for precisely the same reason — antitrust laws prohibited companies from monopolizing both the production and distribution of their products.

It's no wonder why the NFL recoiled hastily to such potential congressional scrutiny. It has a very lucrative business model whose success is due in part to the protection provided by the antitrust exemption.

What we see is a fight between billion-dollar corporations. The NFL Network is not available to large portions of the country on basic cable systems — in part because it wants to foist high fees on cable companies while the cable giants reject such costs as astronomical for so little original programming.

The custodians of the network no doubt thought that a situation like this — the Patriots making history — would arise to push demand and force the cable companies to bend. And they figured they could hang on for awhile without much scrutiny because the Bush Justice Department, which has yet to see a monopoly it wouldn't fight, has set the right tone by being the government lamb to the big business wolf.

We hope that Congress spends minimal time on the matter — there's no shortage of issues to seriously address, and who gets to watch what NFL game should not be in the Top 100 list of any politician.

The NFL has every right to maximize its revenues. But we, like Specter and Leahy, have to ask: Why does the NFL need any antitrust exemption at all, especially when it flaunts it in the face of the government and the American people?

Section 1770 Chapter III of the California Legal Remedies Act of Deceptive Practices (A) states

The following unfair methods of competition and unfair or deceptive acts/practices undertaken

by any person (or corporation) in a transaction intended to result or which results in the SALE or

lease of GOODS OR SERVICES TO ANY CONSUMER (THE PUBLIC) are unlawful. The

National Football League's purpose for going before Congress in 1966 to obtain an antitrust

exemption was to promote the NFL and to assure football fans in the America that they were

going to receive an economic benefit if Congress granted them an exemption to merge or

monopolize the American Football League with the National Football League. The opposite

effect of an economic benefit, however, occurred when the contract the National Football

League (represented by Commissioner Rozelle), and subsidiary franchise team owners of the

League breached the contract made with Congress in 1971, when several owners illegally began

moving their franchises from their traditional cities to other cities where bigger stadiums were

built at taxpayers' expense, defying Commissioner Rozelle's statements that no teams would

relocate to other cities and that 50,000 stadium seating was sufficient for professional football's

needs. The following Sherman Act antitrust violation/civil tort violations were carried out by the

National Football League to the irreparable harm of the plaintiff/"plaintiff class": people of the

state of California:

SHERMAN ACT/CIVIL TORT CONSPIRACY OFFENSES

COUNT I. COMBINATION RESTRAINT OF TRADE IN THE SANCTIONING OF CITIES
TO MARKET PROFESSIONAL FOOTBALL: CONSPIRACY TO RESTRAIN
PROFESSIONAL FOOTBALL IN SANCTIONED CITIES OF THE UNITED
STATES, DEEMED TO BE WITHIN THE PROHIBITION OF CHAPTER 1 AND
3 OF THE SHERMAN ACT

Plaintiff alleges that the National Football League and franchise owners acted in combination

restraint of trade to market professional football among the 23 cities deemed to market

-50-

National Football League franchise teams, for the service of providing football entertainment to U.S. football fans/consumers between 1971 and 1995. The last teams to relocate to other cities illegally—the Los Angeles Rams and the Oakland Raiders (from the city of Oakland, CA. to Los Angeles then back to Oakland)—became the two California professional football teams to carry out these restraint of trade practices with once loyal local and nationwide fans.

COUNT II. 18 USC 1001 FRAUD AND FALSE STATEMENTS

Prior to the National Football League's merger with the American Football League in 1966, the NFL commissioner—then Pete Rozelle—approached members of the 89th Congressional Committee of Congress and asked for an antitrust exemption from the Sherman Act prohibiting conspiracies/monopolies etc. The major point of his testimony given under oath to members of Congress he quoted that "if the merger and exemption from antitrust laws were granted, professional football operations would be preserved in the 23 cities and 25 professional football stadiums where such operations of promoting professional football were being conducted, and that 50,000 seat stadiums were declared to be adequate for professional football's needs. The mere announcement of these commercial messages to the public became a matter of "public interest."

COUNT III. CONTEMPT OF CONGRESS

The National Football League and franchise team owners (single entity) acted together in concert by fraud, and successfully obstructed the work of Congress once they obtained the antitrust exemptions in 1961 and 1966, with the signing of The Sports Broadcasting Act to PROTECT FOOTBALL FANS AND COMMUNITIES, and the NFL/AFL merger when the commissioner stated that NO TEAMS WOULD RELOCATE OUTSIDE OF THEIR TRADITIONAL CITIES AND THAT 50,000 SEAT STADIUMS WERE SUFFICIENT for pro football's needs.

-51-

COUNT IV. CALIFORNIA LEGAL REMEDIES ACT VIOLATION # 9
ADVERTISING SERVICES WITH INTENT NOT TO SELL
THEM AS ADVERTISED TO THE PUBLIC

The NFL commissioner, as the chief executive of the National Football league, was liable for the

conduct of the league team owners when the illegal franchise moves began to take place. Not in

one instance did the National Football League administer punitive reparations for the conduct of

team owners for their breach of trust and broken oaths Commissioner Rozelle promised to

Congress, the plaintiff West Coast Sports & Entertainment-- David R. Flood-- and the Plaintiff

"Class." -- citizens of the state of California representing the public's interest in this case.

COUNT V. CALIFORNIA LEGAL REMEDIES ACT VIOLATION #14
REPRESENTING THAT A TRANSACTION CONFERS A
REMEDY, WHICH IT ACTUALLY DOES NOT HAVE, WHICH
IS PROHIBITED BY LAW

During the National Football League's quest to obtain an antitrust exempt status, the league

commissioner in 1966, Pete Rozelle, stated that if the NFL was not granted an antitrust

exemption that without it franchise moves and franchise failures would occur as a matter of

course within the next few years. Plaintiff West Coast Sports & Entertainment alleges that

the NFL commissioner knew beforehand what was going to take place all along after the

antitrust exemption was granted (ILLEGAL FRANCHISE MOVES) in a conspiracy with

team owners against Congress and the public; and then to blackmail the public later.

COUNT VI. 18 USC 371 CONSPIRACY TO DEFRAUD THE GOVERNMENT

The National Football League's underlying motive to breaking the law was to first

receive an antitrust exemption from it, in the form of false statements, then actions.

COUNT VII. CALIFORNIA LEGAL REMEDIES ACT VIOLATION #17
REPRESENTING THAT THE CONSUMER WILL RECEIVE
AN ECONOMIC BENEFIT IF EARNING OF THE BENEFIT
IS CONTINGENT ON THE NFL RECEIVING THE ANTITRUST
EXEMPTION FIRST FROM CONGRESS (SUBSEQUENT TO THE
CONSUMMATION OF THE TRANSACTION).

The National Football League commissioner, Pete Rozelle stated that along with an

antitrust exemption granted from Congress, football operations would be preserved

in the 23 cities and 25 stadiums where such operations are presently being conducted.

the league committed fraud after being given the antitrust exemption by allowing the

franchise owners to move their teams elsewhere to other cities beginning in 1971, which

was a breach of trust with Congress and the public/plaintiff/class/people of the state of

California after public law 89-800 was signed into law.

COUNT VIII. CALIFORNIA LEGAL REMEDIES ACT VIOLATION #18
MISREPRESENTING THE AUTHORITY OF A REPRESENTATIVE
(NATIONAL FOOTBALL LEAGUE COMMISSIONER) TO
NEGOTIATE THE FINAL TERMS OF A TRANSACTION WITH
A CONSUMER—Congress and the plaintiff/plaintiff class/people of the state
of California.

Once again, Commissioner Pete Rozelle's breach of an obligation made with Congress

resulted in a tortuous interference with a prospective ecomomic expectation for football

fans across the United States. Plaintiff/plaintiffs had no idea several team relocations were

going to take place illegally, in defiance of the terms stated prior to the issuance of the antitrust

exemption from Congress was granted. The displacement of teams, especially the Oakland

Raiders and Los Angeles Rams (to this day), have left plaintiff/plaintiffs in a state of betrayal,

mental anguish, and disassociation, which has greatly added to the plaintiff's mistrust of the

National Football League's business policies and practices, following the NFL/AFL merger.

COUNT VIIII. TORTUOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC
EXPECTATION

-53-

The following elements are valid to allege that the National Football League/franchise owners disrupted or interfered with a prospective obligation to market professional football in the 23 cities that had NFL franchises between 1966 and 1995 without any franchise relocations, spoken under oath by NFL Commissioner Pete Rozelle to members of Congress before they granted him an antitrust exemption, which was later signed into public law (89-800) for the interest of the American public:

1.) There was an economic relationship between the plaintiff/"plaintiff class"—people of the state of California and third party, NFL commissioner and team owners, that no team relocations would occur. Californians were assured that none of their favorite teams would be disenfranchised; the buying of favorite team merchandise etc., would not be disrupted. This contained a probable future economic benefit or advantage to the plaintiff/plaintiff class—people of the state of California.

2.) There was knowledge by the defendants that this economic relationship or obligation was in force with the American public, once the antitrust exemption was granted.

3.) Intentional wrongful acts occurred (illegal team movements and breaking of the contract the NFL commissioner made to Congress under oath) which disrupted the relationship /obligation defendants owed to the American public.

4.) Actual disruption occurred leading to irreparable harm to the plaintiff/plaintiffs—people of the state of California.

In 1995, the California Supreme Court made clear that in order to interfere with a prospective economic advantage, the act that interferes must itself be wrongful. Liability for either tort would be the amount of actual damages for the wrongful acts that were performed .

-54-

# TORTUOUS INTERFERENCE WITH AN ECONOMIC OBLIGATION

## Business fails to pay finders' fees: Intentional interference with prospective economic advantage: Economic loss: Verdict

Law Reporter, Feb 1999

Colangelo v. Morgan, Cal., Solano County Super. Ct., No. L001781, Nov. 11, 1998.

In 1991, Morgan attempted to create Mega Sand, a sand and gold mining business. He formed an agreement with Colangelo and Hyon under which they would locate investors for the business in return for a fee, 10 percent ownership, and yearly payments against anticipated profits. Later that year, Umeno, owner of Taiki Corporation, USA (Taiki), learned of the project through Hyon and began providing funding. By the spring of 1992, after making at least 12 written demands for payment, Hyon and Colangelo remained unpaid. At about the same time, at Umeno's suggestion, a colleague met with Hyon and told him Taiki was not contributing to Mega Sand. Later, the colleague met with Morgan, and they discussed not using Taiki's name in the project, allegedly to disguise the link between Taiki and Mega Sand.

### Related Results

- Company That Lost Big...
- Worker Prohibited From...
- Risk Management: Court Decides...
- Digital Broadens, Deepens...

### Most Popular Articles in Reference

- The importance of ...
- Credit card debt on ...
- Child labor: the real ...
- Your Computer Chair ...
- Sources Of Stress ...
- More

Colangelo and Hyon sued Morgan and Mega Sand under the doctrine of promoter liability, alleging they had breached their agreement with plaintiffs and the covenant of good faith and fair dealing in that agreement. Plaintiffs asserted defendants were liable for quantum meruit and under the doctrine of unjust enrichment.

Plaintiffs also sued Umeno, his colleague, and Taiki as alter egos of Mega Sand, for intentional interference with the contract and prospective economic advantage.

The jury awarded $80.09 million. Mega Sand, Umeno, his colleague, and Taiki were jointly and severally liable for $75.6 million on the intentional counts; Mega Sand was also liable for about $3.57 million on the breach of contract counts; and Morgan was liable for $917,400.

# TORTUOUS INTERFERENCE WITH AN ECONOMIC OBLIGATION

## Worker prohibited from delivering to store: Interference with prospective economic advantage: Emotional distress: Verdict

Law Reporter, Aug 1999

Watson v. Ralphs Grocery Co., Cal., San Diego County Super. Ct., No. SB 1919, Aug. 19, 1998.

Watson delivered products to Ralphs grocery stores as part of his job. Ralphs instituted a policy prohibiting deliveries from any individual who made three or more delivery mistakes in one year. It then sent Watson's employer a letter saying he had made four mistakes and requesting that he stop delivering products to its stores. Watson's employer contacted Ralphs twice to explain that some of the reported "mistakes" had not actually been errors and that Watson would be fired if he could not deliver products to Ralphs grocery stores.

### Related Results

- Company That Lost Big...
- Business Fails To Pay Finders ...
- Risk Management: Court Decides...
- Digital Broadens, Deepens...

**Most Popular Articles in Reference**

- The importance of ...
- Credit card debt on ...
- Child labor: the real ...
- Your Computer Chair ...
- Sources Of Stress ...
- **More »**

Ralphs refused to lift the ban, and Watson's employer fired him. Watson accrued $550 in lost wages.

Watson sued Ralphs, alleging ( 1 ) intentional and negligent interference with prospective economic advantage, (2) state law violation of his property rights, and (3) negligent infliction of emotional distress. Plaintiff alleged he had made only one error and that on the other three occasions the correct product amounts had been delivered to the store.

Defendant argued that plaintiff's employer could have assigned him another delivery route instead of terminating his employment.

The jury awarded about $762,600. The award was reduced 10 percent for the employer's liability.

Plaintiff's expert was Arthur Brodshatzer, economics. San Diego, Cal.

COUNT X. FRAUD BASED ON INNOCENT MISREPRESENTATION BY THE NFL COMMISSIONER PETE ROZELLE

The following elements were met when the National Football League committed innocent misrepresentation in defrauding the plaintiff/plaintiff class (people of the state of California). Commissioner Rozelle declared under oath to Congress and the public's interest that none of the 23 teams in 1966 would relocate to other cities and that 50,000 seat stadiums were adequate for professional football's needs as a promise to obtaining issuance of an antitrust exemption, which became public law 89-800: He made a representation of one or more material facts to the public (plaintiffs/Congress); it was made in connection with the making of a contract between plaintiff and defendant (National Football League/franchise owners); the representation was false when the commissioner declared the oath to Congress and the public interest/plaintiff; plaintiff would not have entered into the contract had it been known that defendant would breach the contract; the plaintiff suffered a loss (grief, trauma, mental anguish) as a result of teams moving to other cities; and plaintiff's loss benefited the franchise owners.

COUNT XI. FRAUD BASED ON BAD-FAITH PROMISE

The following elements were met when the National Football League committed fraud based on A bad-faith promise: Defendants NFL and franchise owners, represented by commissioner Rozelle were at a consensus when commissioner Rozelle said none of the existing 23 teams would relocate to other cities and that 50,000 seat stadiums were declared adequate for pro football's needs as a promise to receive an antitrust exemption from Congress in 1966; at the time the statements were declared both defendants knew they were not going to be kept; the plaintiffs relied on these assurances prior to the issuance of the antitrust exemption; the plaintiffs were damaged psychologically by the deception and breach of the statements made by the NFL league representative.

## COUNT XII. FRAUD BASED ON FALSE REPRESENTATION BY THE NFL COMMISSIONER PETE ROZELLE

The following elements were met when the National Football League committed fraud based on false representation: Defendant, commissioner Pete Rozelle made a representation of material facts when he stated under oath to members of the 89th Congress that prior to receiving an antitrust exemption to merge the National Football League with the American football League, that professional football would be maintained in the 23 cities and 25 football stadiums, and that 50,000 seat stadiums were adequate for professional football's needs in 1966. The representation of the material facts were false when they were spoken; defendant made the representation with the intent that the plaintiffs rely on it; plaintiffs(public interest) relied on the representation; and the plaintiffs were damaged as a result of their reliance on the false statements.

## COUNT XIII. FRAUD BASED ON FAILURE TO DISCLOSE FACTS (SILENT FRAUD)

The following elements were met when the National Football League commissioner failed to disclose the true facts that the franchise owners/Pete Rozelle (commissioner) planned to restrain trade of the sanctioned cities (some), where professional football was already being marketed, for other cities that were willing to pay for bigger stadiums at taxpayers' expense once the antitrust merger exemption was acquired from Congress: The defendant failed to disclose these facts in front of member's of Congress and the plaintiff (public); defendant had actual knowledge of the conspiracy; defendant's failure to disclose the conspiracy ended in the plaintiff having a false impression of the deal; by the commissioner not disclosing the true motives of the antitrust merger, defendant knew the failure would create a false impression, and intended that the plaintiff rely on it; plaintiff relied on the impression that an economic benefit would result; and the plaintiffs were damaged by the breach of the statements/contract.

COUNT XIV. INTENTIONAL INFLICTION OF MENTAL DISTRESS

During the National Football League's wave of franchise relocations from 1971-1995,

a continued breach and disregard of Commissioner Rozelle's promise that none

of the existing 23 teams in the combined 2 leagues would relocate outside of their

traditional cities, added to the plaintiff/"plaintiff class" distrust of their business operations.

COUNT XV. NEGLIGENT PER SE INTENTIONAL INFLICTION OF MENTAL DISTRESS

With the signing of the Sports Broadcasting Act in 1961(15 USC Section 1291), which the

National Football League petitioned Congress to receive an antitrust exemption for as well,

the main stipulation for granting it was to BRING STABILITY TO THE LEAGUE, AND TO

PROTECT FANS AND COMMUNITIES. Reiterating once again, on pages 8-10 of this civil

suit Representatives John Conyers, Jr., Zoe Lofgren, Stephen E. Buyer, and Ed Bryant dissented

on signing H. R. Bill 2740 into law after concluding that MANDATORY EXPANSIONS

WERE INAPPROPRIATE; THAT UNNECESSARY INTERVENTION INTO SPORTS

CONTRACTING ARRANGEMENTS WERE NOT IN THE U.S. GOVERNMENT'S BEST

INTRESTS; AND THAT THEY WOULD EXACERBATE FINANCIAL PROBLEMS

PROFESSIONAL SPORTS LEAGUES WOULD INCUR, WHICH WOULD LEAD TO

DESTABILIZATIONS.

COUNT XVI. 18 USC 1031 MAJOR FRAUD AGAINST THE UNITED STATES

With the illegal NFL team movements that breached a verbal contract with Congress and an

economic obligation with the American public, due to the fraudulent statements of the National

Football League commissioner Pete Rozelle stated under oath, as well as that fans and

communities would be protected (spelled out in black in white) in the 1961 Sports Broadcasting

Act, the National Football League without a doubt defrauded the American public.

## TEST FOR COMMERCIAL SPEECH TO BE REGULATED
## (UNITED STATES SUPREME COURT)

1.) First, the test asks whether the commercial speech concerns unlawful activity or is misleading. If so, then it is not protected by the First Amendment.

Plaintiff's answer vs. defendants is YES: LANHAM ACT 43(a) 1125 A&B (FEDERAL UNFAIR COMPETITION LAW) PERTAINING TO DEFENDANT'S BUSINESS OPERATIONS CONCERNING FRAUD; THE CALIFORNIA UNFAIR COMPETITION LAW (SB 122); CALIFORNIA CONSUMER LEGAL REMEDIES ACT; THE FEDERAL TRADE COMMISSION ACT; SHERMAN ACT; AND PER SE VIOLATIONS. DEFENDANT'S UNLAWFUL BUSINESS ACTIVITIES PRE-EMPTED THE GUIDELINES STATED IN EACH OF THE LAW'S AND ACT'S STATUTES.

2.) Does the commercial speech determine whether the asserted governmental interest is substantial?

Plaintiff's answer vs. defendants is YES: TO PREVENT ANTITRUST VIOLATIONS AND FRAUD FROM BEING ASSIMULATED AND PRACTICED IN U.S. COMMERCE AND TRADE.

3.) Does the regulation directly advance the governmental interests asserted, and is it more extensive than necessary to serve that interest?

Plaintiff's answer vs. defendant is YES: FOUR GENERATIONS OF CALIFORNIANS AND OTHER CITIZENS OF THE UNITED STATES HAVE BEEN MISLED BY THE DEFENDANT'S UNLAWFUL BUSINESS ACTIVITIES INVOLVING U.S. COMMERCE AND TRADE.

ALL THREE INQUIRIES MUST BE, AND ARE ANSWERED IN THE AFFIRMATIVE IN ORDER FOR COMMERCIAL SPEECH TO BE FOUND CONSTITUTIONAL AND TO BE REGULATED BY THE UNITED STATES GOVERNMENT.

## CALIFORNIA SUPREME COURT DEFINITION OF COMMERCIAL SPEECH

States that representations of fact about a company's own business operations for the purpose of promoting product sales (in this case professional football) constitutes commercial speech.

WHEREFORE, Plaintiff and the "plaintiff class" pray for relief as follows:

1. Appointment of United States Marshalls to administer service of civil briefs to the defendants etc., subsequent to plaintiff's Forma Pauperis declaration; certification of the "class" and any subclasses the Court deems appropriate; appointment of Plaintiff as class representative; and appointment of Counsel by the Court to Plaintiff and the "plaintiff class," after satisfying precepts of Federal Rule 23.

2. Restitution for the plaintiff's pain and suffering, mental anguish, and irreparable harm; punitive damages, compensatory damages, disgorgement of profits, and treble damages, as well as exemplary damages for the "plaintiff class, included but not limited to cost and attorney fees; pre-judgement and post-judgement interest at the maximum legal rate; and such other relief as the Court deems just and appropriate.

3. A court decree granting an exparte seizure order of all counterfeited material (merchandise etc., bearing defendant's deceitful spurious mark); a cease and desist order of all print ads, television coverage/commercials marketing defendant (Oakland Raiders') mark, and a settlement conference on behalf of the plaintiff/ plaintiff class, for all counts and complaints in this civil suit involving the National Football League, Oakland Raiders, NFL Properties, NFL Films, Reebok Inc., and NFL owners.

4. A Court decree for professional football to be played in the geographic area where the plaintiff resides, inside a stadium comparable to seating 50,000 spectators according to the antitrust exemption pre-declaration for two of the defendant's (Oakland Raiders') home pre-season games, and four regular season games and playoffs starting in 2008.

-61-

WHEREFORE, Plaintiff and the "plaintiff class" pray for relief as follows:

I.    Appointment of the United States Marshalls to administer service of civil briefs to the defendants etc., subsequent to the plaintiff's Forma Pauperis declaration, certification of the "class" and subclasses the Court deems appropriate; appointment of Plaintiff as class representative; and appointment of Counsel by the Court to Plaintiff and "plaintiff class," after satisfying precepts of Federal Rule 23.

II.    Restitution for the plaintiff/plaintiff classes' pain and suffering, mental anguish, and irreparable harm in the form of punitive damages, compensatory damages, disgorgement of profits, treble damages, exemplary damages, included but not limited to cost and attorney fees, pre-judgement and post-judgement interest at the maximum legal rate, and such other relief as the Court deems just and appropriate.

III.    A court decree granting an exparte seizure order of all counterfeited material (merchandise etc., bearing defendant's (Oakland Raiders) deceitful spurious mark; a cease and desist order of all print ads, television coverage/commercials marketing defendant's spurious mark, and a settlement conference on behalf of the Plaintiff and plaintiff class, for all counts and complaints in this civil suit involving the National Football League, Oakland Raiders, NFL Properties, NFL Films, Reebok Inc., and NFL owners who moved their teams illegally.

IV.    A court decree for professional football to be played in the geographic area where the Plaintiff resides, inside a stadium comparable to seating 50,000 spectators according to the antitrust exemption precepts for: Two of the defendant (Oakland Raiders') home pre-season games, and four regular season games and playoffs starting in 2008.

## JURISDICTION AND VENUE

This civil suit is filed and these proceedings are instituted pursuant to California Business and Professions Code 17203 and 17204; CA. Civil Code 1752, 1770, 1780, and 1781; California Legal Remedies Act; Federal Unfair Competition Law Lanham Act 15 USC 1125, 1064 paragraph 3, and 15 USC 1052 A & E; Federal Trade Commission Act; and the Sherman Act chapters 1 & 3. This court has jurisdiction over this action pursuant to 28 USC 1332 A, C, and D. The court may apply federal law to all class members who are California residents. Additionally, since federal and state courts can try the same offenses where both institutions hold different sovereignties, this civil action is being tried in federal court pursuant to the California state and federal offenses which occurred. The defendant's attempt to conceal violations occurred throughout the state of California. Venue is proper in this court pursuant to 28 USC 1391 (A). The irreparable harm done to football consumers occurred in Sacramento county and throughout the state of California. The National Footall League, team owners, NFL Properties, NFL Films, and Reebok Inc., does business in this county and state marketing the NFL, selling merchandise bearing NFL team logos and franchise names. Plaintiff stated the causes of action under federal and state law as torts occurred in California and the United States. The defendant's silent fraud and cover-up of torts combined with the NFL's marketing and business operations led millions of football consumers to be defrauded and blackmailed by false statements along with an all-out effort on behalf of the franchise owners/League to restrain trade amongst designated franchise cities that lost franchises due to relocation. Additionally, their negligent acts to intentionally interfere with a prospective economic advantage irreparably harmed and caused extreme emotional distress, sense of loss, anguish, and pain to the plaintiff/"plaintiff class"—people of the state of California from 1971-1995.

## DECLARATION OF DAVID RODERICK FLOOD
## PURSUANT TO CIVIL CODE 1780 (c)

I, DAVID R. FLOOD, declare as follows:

1. I am acting on behalf of myself, West Coast Sports & Entertainment, and the people of the state of California as a pro se litigant in a motion to the Federal Court to grant the plaintiff/"plaintiff class" Federal Counsel for adjudication proceedings of this case, to be carried out in the United States District Court For The Eastern District of California. I have compiled lawful knowledge of the matters brought before the judge overseeing this case and hereby respectfully demands a jury trial and bench trial for the "certifiable class" claims and individual claims so triable.

Dated: January 7, 2008                    Respectfully submitted,

By _____
David R. Flood

-63-